**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **ALARM.COM INCORPORATED,**<br>**8281 Greensboro Drive, Suite 100**<br>**Tysons, VA 22102,**<br><br>                    Plaintiff,<br><br>    v.<br><br>**DAVID BERMAN,**<br>**6717 West Los Flores Drive**<br>**Meridian, ID 83646,**<br><br>                    Defendant. | No. |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff Alarm.com Incorporated ("Alarm.com" or the "Company"), by counsel, files this Complaint against Defendant David Berman ("Berman") as follows:

## INTRODUCTION

1.    This action arises from a brazen and calculated breach of contractual and loyalty obligations by Berman, a former Account Executive at Alarm.com, a leading provider of smart home security and automation solutions. In the weeks preceding his resignation, Berman surreptitiously stole highly sensitive and proprietary business information—such as Alarm.com's sales and business plans, pricing data, and confidential customer lists and dealer data—by emailing it to his personal account. Within mere days of leaving Alarm.com, Berman assumed a substantially similar role with Ajax Systems ("Ajax"), a direct competitor operating in the same geographic territory and targeting the same dealer network. Berman's conduct was not accidental or incidental—it was deliberate, premeditated, and purposely intended to confer an unfair competitive advantage upon himself and Ajax at Alarm.com's expense.

2.     Berman's actions violate his duties to the Company including his contractual obligations that prohibit the misuse of confidential information along with post-employment competition and solicitation within narrowly tailored parameters. Berman's unlawful actions have inflicted—and continue to inflict—irreparable harm on Alarm.com's competitive standing and goodwill. Alarm.com, therefore, brings this action to enjoin further violations, recover damages, and hold Berman accountable for his unlawful conduct.

## JURISDICTION AND VENUE

3.     This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and complete diversity of citizenship exists between the parties. Alarm.com is a citizen of Virginia and Delaware. Berman is a citizen of Idaho. *See* 28 U.S.C. § 1332(a).

4.     This Court also has federal question jurisdiction over this action because Alarm.com is asserting a claim under the federal Defend Trade Secrets Act.

5.     The Court has personal jurisdiction over Berman because, in the contract underpinning Alarm.com's breach of contract claim against Berman, he consented to the jurisdiction of this Court.

6.     Venue in this Court is proper because, in the contract underpinning Alarm.com's breach of contract claim against Berman, Berman consented to this specific venue.

## THE PARTIES

7.     Alarm.com is an award-winning smart home and business security platform that millions of customers depend on every day. The Company's products are sold, installed, and supported by a network of thousands of professional service providers around the world.

8.     Alarm.com is incorporated in Delaware, has its corporate headquarters in Tysons,

Virginia, and has offices across the United States.

9.    Berman is an individual person residing in Idaho.

10.    Ajax is an international technological company and Europe's largest security system manufacturer. The company offers solutions for video surveillance, smart homes, fire detection, and flood prevention. Its product portfolio includes a variety of wireless and wired devices for security and automation.

11.    Ajax is a direct competitor of Alarm.com. Alarm.com and Ajax compete primarily in the smart home security market, with overlapping offerings in intrusion detection, video surveillance, and connected devices for residential and commercial use.

12.    Although headquartered in Europe, Ajax is actively and aggressively expanding into the U.S. market. Ajax has made strategic moves in 2025 to strengthen its U.S. presence, including leadership appointments and product launches tailored to U.S. consumers.

## ALARM.COM'S BUSINESS

13.    Alarm.com operates a B2B2C business model centered on a cloud services platform for smart security, home automation, and video monitoring. Alarm.com is also involved in designing and manufacturing various types of hardware that enable its solutions, including video cameras and doorbells, thermostats, and cellular communications modules and gateways.

14.    Alarm.com does not sell directly to consumers. Instead, it partners with thousands of service providers, including dealers, installers, and system integrators who resell Alarm.com's products and services to end-user customers. These authorized service providers handle installation, customer support, and billing, and pay Alarm.com monthly fees for each active subscriber.

15.    Given Alarm.com's business model, some of its most sensitive confidential

information includes the details of its current and prospective dealer customers, business and sales strategies, and pricing data.

## BERMAN'S EMPLOYMENT WITH ALARM.COM

16.     On February 11, 2019, Alarm.com hired Berman as an Account Executive. In this role, Berman was responsible for, among other things: managing and developing a large set of assigned dealer accounts to increase productivity and sales of Alarm.com services and products; initiating and executing on-site dealer product training activities and working closely with other Company employees to develop dealer training plans; and collaborating with other Alarm.com employees to identify target dealers and to coordinate sales and support efforts. During his tenure as an Account Executive, Berman was responsible for a sales territory covering northern California, the Pacific Northwest, and Alaska.

17.     In consideration of Berman's employment with Alarm.com, Berman was required at the inception of his employment to sign an Invention Assignment and Restrictive Covenants Agreement with the Company (the "Agreement"). The Agreement included provisions designed to protect Alarm.com's legitimate business interests, including its trade secrets, confidential information, goodwill, and customer, dealer and employee relationships. A true and accurate copy of the Agreement, signed by Berman on or about January 25, 2019, is attached hereto and incorporated herein by reference as **Exhibit 1.**

18.     Section 3 of the Agreement is designed to protect Alarm.com's trade secrets.  It states as follows:

> 3.     **Covenant Not to Disclose Trade Secrets.** During the term of his/her employment with Alarm.com and after the termination thereof, for whatever reason, Employee will not, except as expressly authorized or directed by Alarm.com, use, copy, duplicate, transfer, transmit, disclose, or permit any unauthorized person access to, any of Alarm.com's Trade Secrets. Consistent with the Virginia Uniform Trade Secrets Act, "Trade Secrets" shall mean any data or

information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Trade Secrets include, but are not limited to, information about Alarm.com's technology, customer lists, information about Alarm.com's customers and dealers, information about Alarm.com's executives and employees, marketing strategies, price lists, pricing, Alarm.com's business methods, and contracts and contractual relations with Alarm.com's customers and dealers.

(Agreement, Exhibit 1, § 3).

19.    Section 4 of the Agreement, which is designed to protect Alarm.com's confidential

information, states as follows:

4.    **Covenant Not to Disclose Confidential Information.** During the term of his/her employment with Alarm.com and for a period of three (3) years after the termination thereof, for whatever reason, Employee will not, except as expressly authorized or directed by Alarm.com, use, copy, duplicate, transfer, transmit, disclose, or permit any unauthorized person access to, any of Alarm.com's Confidential Information. "Confidential Information" shall mean any data or information, whether or not reduced to written or recorded form, that is related to Alarm.com and that is not generally known to competitors of Alarm.com nor intended for general dissemination, whether furnished by Alarm.com or compiled by Employee. Confidential Information includes, but is not limited to, information about Alarm.com's technology, customer names, customer lists, information about Alarm.com's customers and dealers, information about Alarm.com's executives and employees, marketing strategies, price lists, pricing, Alarm.com's business methods, and contracts and contractual relations with Alarm.com's customers and dealers. Confidential Information shall not include any data or information that has been voluntarily disclosed to the public by Alarm.com (except where such public disclosure has been made by Employee without authorization) or that has been independently developed and disclosed by others, or that otherwise enters the public domain through lawful means.

*Id.* at § 4.

20.    In addition, Section 5 of the Agreement states as follows:

5.    **Covenant Not to Compete.** During the term of his/her employment with Alarm.com and for a period of two (2) years after the termination thereof, for whatever reason other than termination by the Company without cause, Employee will not, except as expressly authorized or directed by Alarm.com, directly or

indirectly engage in the provision of wireless and web-enabled security system technology or wireless health solutions that competes with any product or service then offered by Alarm.com, in any capacity identical with or corresponding to the capacity or capacities in which he/she was employed by Alarm.com, anywhere within the geographic territory serviced by Employee within the last twelve (12) months of his/her employment with Alarm.com.

*Id.* at § 5.

21.    Furthermore, Section 6 of the Agreement states as follows:

6.    **Covenant Not to Solicit Customers or Dealers.** During the term of his/her employment with Alarm.com and for a period of two (2) years after the termination thereof, for whatever reason other than termination by the Company without cause, Employee will not, except as expressly authorized or directed by Alarm.com, directly or indirectly, solicit, divert, take away, contact, call upon, accept business from, or service any then-current customer or dealer of Alarm.com for the purpose of providing any wireless and web-enabled security system technology or wireless health solution that competes with any product or service then offered by Alarm.com.

*Id.* at § 6.

22.    Additionally, Section 8 of the Agreement states as follows:

8.    **Return of Documents.** Upon request of Alarm.com or within seven (7) days after the termination of employment with Alarm.com, Employee will deliver to Alarm.com all files, data, memoranda, notes, records, drawings, manuals, computer disks, or other documents constituting or concerning Confidential Knowledge or Trade Secrets, or the business of Alarm.com, that are in the possession, custody or control of Employee, whether made or compiled by Employee, furnished to Employee by Alarm.com, or otherwise obtained by him/her in the course of his/her employment with the Company, including all tangible and electronic copies thereof.

*Id.* at § 8.

23.    Given the importance of these covenants, in Section 9 of the Agreement, Berman

agreed as follows:

9.    **Reasonableness of Covenants.** Employee acknowledges and agrees that the restrictive covenants contained in this Agreement are reasonable in time, area, scope of activity, and all other respects; that the restrictions are narrowly drafted to protect Alarm.com's legitimate business interests, including but not limited to its Trade Secrets, Confidential Information, goodwill, and customer,

dealer and employee relationships; and that the restrictions do not curtail Employee's legitimate efforts to earn a livelihood. Employee further acknowledges that any injury Alarm.com would suffer in the event of Employee's breach or threatened breach of any restriction in the Agreement cannot be compensated by monetary damages alone, and Employee therefore agrees that Alarm.com, in addition to and without limiting any other remedies or rights that it may have, shall have the right to obtain an injunction against Employee from any court of competent jurisdiction, enjoining any such breach without the necessity of posting a bond or surety, and that Employee shall reimburse Alarm.com for its reasonable costs and attorney's fees of any such action in which it is the prevailing party.

*Id.* at § 9.

### <u>BERMAN DELIBERATELY STEALS CONFIDENTIAL INFORMATION</u>

24.    Beginning at least as early as August 27, 2025, and unbeknownst to the Company, Berman began forwarding from his Alarm.com work email account (dberman@alarm.com) to his personal iCloud account (dj_berman@icloud.com) a large volume of the Company's confidential information. His systematic theft of information began approximately three weeks before his September 19, 2025 resignation, and, upon information and belief, at a time when Berman was intent on or at least considering leaving the Company for its competitor, Ajax.

25.    The Company confidential information Berman forwarded to his personal iCloud account included the following:

- On August 27, 2025, Berman forwarded himself an email reflecting a Company internal email with detailed information about Alarm.com's pricing structure for certain Alarm.com service packages.

- On August 27, 2025, Berman forwarded himself an email which includes a detailed list of over 35 store manager contacts in the western territory for one of Alarm.com's hardware distributor customers.

- On August 27, 2025, Berman forwarded himself an email which included as an attachment a Microsoft Excel spreadsheet naming over 400 Alarm.com nationwide sub-dealer customers affiliated with one of Alarm.com's largest dealers.

- On August 27, 2025, Berman forwarded himself an email titled "FW: Alarm.com," which included an email dated June 28, 2024, including a list of names, corresponding titles, and email addresses for contacts at a prospective dealer

customer.

- On August 27, 2025, Berman forwarded himself an email titled "FW: Questions," reflecting a September 17, 2024 email including a list of contact names and email addresses with one of Alarm.com's dealers.

- On August 27, 2025, Berman forwarded himself an email titled "FW: Alarm.com contact information," reflecting a November 5, 2025 email including another list of contact names, titles, email addresses, and telephone numbers for a prospective dealer customer.

- On August 27, 2025, Berman forwarded himself an email titled "FW: Alarm.com meeting request," reflecting an email dated December 27, 2024 which included a detailed list of names, job titles, emails, and telephone numbers for various contacts at another Alarm.com dealer customer.

- On August 27, 2025, Berman forwarded himself an email titled "FW: Com," which included a December 31, 2024 email reflecting notes Berman previously drafted regarding a guide "to assist [Alarm.com] Security Consultants in designing and selling Alarm.com commercial security solutions."

- On August 27, 2025, Berman forwarded himself an email reflecting contact information with another prospective dealer customer.

- On August 27, 2025, Berman forwarded himself an email reflecting an email from one of Alarm.com's authorized distributors asking if Alarm.com sells a hardware product that can integrate with a certain brand of security panel.

- On August 27, 2025, Berman forwarded himself an email reflecting the contact information and an inquiry from an Alarm.com dealer regarding pricing for certain Alarm.com service packages.

- On August 27, 2025, Berman forwarded himself an email titled "FW: New System," reflecting the contact information for the owner of a prospective dealer.

- On September 2, 2025, Berman forwarded himself an email with the contact information for the Smart Home Manager of a prospective dealer customer.

- On September 4, 2025, Berman forwarded himself an email titled "FW: NW stats," which included as an attachment a Microsoft Excel spreadsheet titled, "TerritoryDrivers.xlsx." This Excel spreadsheet, from September 2025, reflects revenue metrics, by customer, for over 850 dealers in Berman's sales territory.

- On September 9, 2025, Berman forwarded himself an email which included three attachments reflecting detailed business and financial information regarding another of Alarm.com's dealers.

- On September 11, 2025, Berman forwarded himself an email titled "FW: Northwest Territory Game Plan – Alarm.com," reflecting detailed strategic information regarding Alarm.com's sales territory focus, strategic objectives, key initiatives, collaboration workflow, metrics to track, and strategic next steps.

- On September 11, 2025, Berman forwarded himself an email titled "FW: Price Sheets," which included as attachments two spreadsheets reflect Alarm.com's confidential pricing structures for its service plans.

- On September 11, 2025, Berman forwarded himself an email with the contact information for another one of Alarm.com's dealers.

- On September 11, 2025, Berman forwarded himself an email which included as an attachment reflecting a detailed nationwide contact list for another one of Alarm.com's dealers.

- On September 11, 2025, Berman forwarded to himself an email titled "Fw: Alarm.com New Service Provider Application - Steps to Reopen Existing Account," which included a .pdf attachment consisting of a confidential credit application with one of Alarm.com's dealers.

- On September 11, 2025, Berman forwarded himself an email titled "FW: Service/subscription Pricing," with the contact information for another of Alarm.com's dealers.

26.    Berman was not authorized by Alarm.com to transmit any of this data to his personal email account.

27.    The timing, content, and volume of Berman's transfers leave little room for benign interpretation. In the days immediately preceding his resignation, Berman selectively forwarded to his personal email account large volumes of internal communications and spreadsheets containing granular contact information, account histories, and strategic notes concerning Alarm.com's network of dealer customers. These were not random or incidental transfers—they were targeted extractions of precisely the kind of intelligence one would need to replicate Alarm.com's sales strategy and poach its most valuable relationships. Berman's access to this data was conditioned on his contractual and common-law duties to protect it; his decision to take it

9

right before joining a direct competitor indicates he intended to use it to Alarm.com's disadvantage.

## BERMAN RESIGNS HIS EMPLOYMENT

28.    Shortly after sending the data described in Paragraph 25 to his personal email account, from September 16-18, 2025, Berman attended an in-person conference at Alarm.com's Tysons, Virginia headquarters.  At this conference for internal members of the Alarm.com Sales department, hosted by Alarm.com's SVP of North American Sales, Berman became privy to some of Alarm.com's most sensitive new product offerings and sales strategies.

29.    Immediately after this in-person sales summit, on September 19, 2025, Berman advised Alarm.com that he was voluntarily resigning his employment with Alarm.com, effective October 3, 2025.

30.    At the time Berman advised Alarm.com that he was voluntarily resigning his employment, Berman advised his manager that Berman did not have another employment opportunity lined up and would be taking time off.

31.    After Berman told Alarm.com that he was voluntarily resigning his employment, Alarm.com learned that Berman had stolen the data described in Paragraph 25 to his personal email account.  In addition, the Company learned that Berman had accepted employment with Ajax, one of Alarm.com's direct competitors.

32.    Indeed, Berman's public-facing LinkedIn profile reflects that, as of October 2025, he is now a "Territory Manager" for Ajax based in Meridian, Idaho, who is "Growing Ajax Systems' Dealer Network Across the USA."  Specifically, in this new role, Berman is:

> Responsible for driving regional growth by building and maintaining strong relationships with customers in the Ajax area. Focused on identifying new sales opportunities, expanding existing accounts, and consistently meeting performance targets. Promotes Ajax Systems' innovative security solutions to local alarm

dealers, ensuring product visibility and market penetration. Actively monitors industry trends and competitor activity to inform strategy and stay ahead of market shifts. Represents Ajax Systems at trade shows, client meetings, and regional events to strengthen brand presence and foster long-term partnerships.

A true and accurate copy of Berman's public-facing LinkedIn profile as of October 16, 2025, is attached hereto and incorporated herein by reference as **Exhibit 2**.

33.     These job duties align with, and are substantially identical to, Berman's prior job duties for Alarm.com.  For example, on his LinkedIn page, Berman lists "Account Management" and "Sales Presentations" as the skills utilized for each position.  He also makes clear on his LinkedIn page that his job with Ajax involves "new sales opportunities," "innovative security solutions," "ensuring product visibility and market penetration," and actively monitoring "competitor activity to inform strategy."  *See* Exhibit 2.

34.     Given Berman's concerning conduct, on September 29, 2025, Alarm.com sent Berman a cease-and-desist letter that, among other things: reminded Berman of his obligations in the Agreement; advised Berman of Alarm.com's awareness of his theft of the Company's data; advised Berman of Alarm.com's awareness that Berman had accepted a position with Ajax; and demanded that Berman immediately (1) cease all communications with Ajax and decline any offer of employment with Ajax, (2) return and permanently delete all Alarm.com confidential information in Berman's possession, and (3) review, sign, and return to Alarm.com an attached sworn declaration affirming that Berman would comply with all of Berman's post-employment obligations to the Company.  A true and accurate copy of this letter is attached hereto and incorporated herein by reference as **Exhibit 3**.

35.     The same day, Alarm.com also sent Ajax a letter, advising Ajax that, among other things: Berman's planned employment with Ajax clearly violated Berman's non-competition obligations to Alarm.com; Berman had transmitted the Company's data to his personal email

11

account; and Ajax's decision to employ Berman despite this knowledge would constitute tortious interference with the Company's contractual rights.  A true and accurate copy of this letter is attached hereto and incorporated herein by reference as **Exhibit 4**.

36.     Berman's employment with Alarm.com formally terminated on October 3, 2025.

37.     Over the ensuing weeks, the undersigned met and conferred with Berman's counsel to attempt to obtain assurances from Berman that he would adhere to the terms and conditions of his Agreement with Alarm.com, and not continue to unlawfully retain or utilize Alarm.com's confidential information.

38.     On Sunday, October 19, 2025, Berman's counsel transmitted to the undersigned a unique under-oath declaration from Berman, which was materially different from the declaration Alarm.com asked Berman to sign (the "Berman Declaration").  A true and accurate copy of the Berman Declaration is attached hereto and incorporated herein by reference as **Exhibit 5.**

39.     In the Berman Declaration, Berman attempts to distinguish between his former job duties for Alarm.com and his purported new job duties for Ajax.  Specifically, Berman contends that he has been "hired as an employee with Ajax Systems.  While Alarm.com repeatedly instructed us to indicate we were a 'software company', Ajax Systems is first and foremost a hardware manufacturer, with some software interfaces.  While I continue to work in the alarm industry and with dealer networks, I am simply not engaged in the same job functions or responsibilities.  In my current position, I primarily sell hardware solutions that are manufactured by Ajax Systems. . . . In my current position, I do not receive an upsell credit or compensation for any software sales.  My primary position is selling hardware.  Certainly, clients have the option to elect in a related software solution but that is not the core of my position."  (Berman Declaration ¶¶ 12–13).

40.    Despite Berman's attempt to downplay his current role at Ajax, his own declaration reveals significant hedging that underscores ongoing direct competition with Alarm.com.  Berman concedes that he continues to work "in the alarm industry and with dealer networks," which mirrors the core market and customer base he served at Alarm.com.  While he claims his "primary position is selling hardware," he admits that clients "have the option to elect in a related software solution," and notably fails to disclaim any involvement in facilitating or promoting those software sales. This language is carefully crafted to suggest separation from software functions while implicitly acknowledging their integration into his sales efforts.

41.    Moreover, Berman's assertion that he does not "receive an upsell credit or compensation for any software sales" is misleading.  The absence of direct commission does not negate his role in driving software adoption, especially when software is bundled with or essential to the hardware solutions he likely sells. His declaration avoids denying that he discusses, recommends, or supports software offerings as part of his sales process—an omission that further confirms his continued engagement in the same competitive space.  These evasive statements, taken together, demonstrate that Berman remains actively involved in selling integrated alarm solutions that include software components, in direct violation of his non-compete obligations.

42.    In addition, in the Berman Declaration, Berman states:

Because I was concerned about how commissions were being paid and I wanted to ensure was paid for all my accounts, I e-mailed myself certain pricing and account information.  The purpose of e-mailing myself these records was to verify how I was being paid on outstanding commissions and to ensure I had sufficient data to analyze my compensation.  In addition, I made a mistake by e-mailing myself certain documents that should have stayed with my employer.  To the extent I felt I needed certain documents to verify my final commission accounting, I should have discussed this with Alarm.com human resources personnel.

(Berman Declaration ¶ 7).

43.    Berman's explanation for systematically forwarding Alarm.com's confidential

information to his personal email account is both implausible and revealing.  He claims the purpose was to verify his commission payments, yet the breadth and nature of the documents he transmitted —including strategic territory plans, detailed customer contact lists, internal pricing sheets, activation metrics, and confidential service provider applications—far exceed what would be necessary for any legitimate compensation review.  This was not a targeted inquiry into commission records; it was a sweeping and calculated transfer of proprietary business intelligence. Berman's admission that he "made a mistake" by taking documents that "should have stayed with [his] employer" is a tacit acknowledgment of wrongdoing, but it does not excuse the volume, timing, or sensitivity of the information taken.

44.    Indeed, Berman began this data transfer weeks before his resignation and while he was contemplating a move to a direct competitor.  His failure to raise any commission concerns with Alarm.com's human resources department—which he now concedes would have been the appropriate channel—further undermines his justification.  The sheer scope of the materials taken, many of which relate directly to Alarm.com's dealer relationships and pricing strategies, indicates that Berman was preparing to leverage this information in his new role at Ajax Systems. His conduct reflects not a benign accounting concern, but a deliberate breach of trust and a violation of his contractual and fiduciary obligations.

45.    In the Berman Declaration, Berman also states he has "deleted all Alarm.com records on all [his] devices." (Berman Declaration ¶ 8).  However, Berman's purported subsequent deletion of the misappropriated materials does not cure or negate his initial act of misappropriation. Moreover, Berman's purported deletion does not eliminate the risk that the information was viewed, retained, or disseminated in whole or in part, nor does it restore the secrecy or competitive advantage that Plaintiff lost because of the misappropriation.

14

46.    As of the filing of this Complaint, Berman remains employed by Ajax in this directly competing role as Ajax's Territory Manager.

47.    In addition, upon information and belief, since Berman began his employment with Ajax, Berman solicited at least one of Alarm.com's current distributors to provide Ajax products or services competitive with Alarm.com's.

48.    Ajax has knowledge of Berman's contractual obligations to Alarm.com yet continues to employ him in disregard of those obligation and directly interfering with the Company's rights.

49.    Berman's and Ajax's conduct indicates a desire to unfairly and unlawfully exploit Alarm.com's confidential information for the benefit of Berman, Ajax, and potentially other third parties.

## COUNT I – BREACH OF CONTRACT – CONFIDENTIAL INFORMATION AND DELIVERY OF COMPANY DOCUMENTS

50.    Alarm.com incorporates and re-alleges paragraphs 1 through 48 of this Complaint as if those allegations are fully set forth in this paragraph.

51.    All conditions precedent necessary for the enforcement of the Agreement have been satisfied.

52.    The Agreement protects Alarm.com's legitimate business interests, including but not necessarily limited to its trade secrets, confidential information, goodwill, and customer, dealer and employee relationships.

53.    Berman entered into a valid and enforceable confidentiality covenant with Alarm.com by signing the Agreement, which Alarm.com is entitled to enforce.

54.    Berman received sufficient consideration for signing and entering into the Agreement in the form of employment with Alarm.com.

55.     Based on Berman's conduct to date, Alarm.com reasonably infers and believes that Berman has breached his confidentiality obligations under the Agreement by using, copying, duplicating, transferring, transmitting, disclosing, or permitting unauthorized persons—specifically, Ajax—access to Alarm.com's Confidential Information.

56.     In addition, by transmitting and retaining the documents identified in Paragraph 25, Berman has breached his obligation to promptly deliver to Alarm.com all files, data, memoranda, notes, records, drawings, manuals, computer disks, or other documents constituting or concerning the business of Alarm.com, that are in his possession, custody or control.

57.     Berman's wrongful actions have proximately damaged Alarm.com's legitimate business interests and have denied Alarm.com the benefit of its bargain with respect to the Agreement.

58.     Alarm.com has been injured irreparably and otherwise, as a direct and proximate result of the breaches of contract by Berman and has suffered damages in an amount to be proved at trial.  Alarm.com will continue to suffer irreparable harm in the absence of injunctive relief to prevent the violation of its rights.

## COUNT II – BREACH OF CONTRACT – BREACH OF COVENANT NOT TO COMPETE

59.     Alarm.com incorporates and re-alleges paragraphs 1 through 57 of this Complaint as if those allegations are fully set forth in this paragraph.

60.     All conditions precedent necessary for the enforcement of the Agreement have been satisfied.

61.     The Agreement protects Alarm.com's legitimate business interests, including but not necessarily limited to its trade secrets, confidential information, goodwill, and customer, dealer and employee relationships.

62.    Berman entered into a valid and enforceable covenant not to compete with Alarm.com by signing the Agreement, which Alarm.com is entitled to enforce. Specifically, Berman agreed that during the term of his employment with Alarm.com and for a period of two (2) years after the termination thereof, for whatever reason other than termination by the Company without cause, Berman would not, except as expressly authorized or directed by Alarm.com, directly or indirectly engage in the provision of wireless and web-enabled security system technology or wireless health solutions that competes with any product or service then offered by Alarm.com, in any capacity identical with or corresponding to the capacity or capacities in which he was employed by Alarm.com, anywhere within the geographic territory serviced by Berman within the last twelve (12) months of his employment with Alarm.com.

63.    Berman received consideration for signing and entering into the Agreement in the form of employment with Alarm.com.

64.    By commencing and continuing employment as Ajax's Territory Manger based in Meridian, Idaho, Berman has breached his non-competition obligations to Alarm.com.

65.    Berman's wrongful actions have proximately damaged Alarm.com's legitimate business interests and have denied Alarm.com the benefit of its bargain with respect to the Agreement.

66.    Alarm.com has been injured irreparably and otherwise, as a direct and proximate result of the breaches of contract by Berman and has suffered damages in an amount to be proved at trial. Alarm.com will continue to suffer irreparable harm in the absence of injunctive relief to prevent the violation of its rights.

## <u>COUNT III – BREACH OF THE DUTY OF LOYALTY</u>

67.    Alarm.com incorporates and re-alleges paragraphs 1 through 65 of this Complaint

as if those allegations are fully set forth in this paragraph.

68.     During and after Berman's employment with Alarm.com, Berman had an ongoing duty of loyalty to Alarm.com as his employer to refrain from taking actions to benefit himself or third parties to Alarm.com's detriment.

69.     While he was still employed by Alarm.com, Berman breached the duty of loyalty that he owed to Alarm.com and is engaged in an ongoing and continuing pattern of breaching that duty.

70.     Specifically, during Berman's employment with Alarm.com, Berman took actions for his own benefit or the potential benefit of others, and to the detriment of Alarm.com, by: stealing the data described in Paragraph 25 to his personal email account, and by other means yet determined.

71.     Berman's actions were willful, knowing, intentional, and malicious.

72.     Alarm.com has been injured irreparably and otherwise as a direct and proximate result of the breaches of the duty of loyalty by Berman and has suffered damages in an amount to be proved at trial. Alarm.com will continue to suffer irreparable harm in the absence of injunctive relief to prevent the violation of its rights.

## COUNT IV – VIOLATIONS OF THE FEDERAL DEFEND TRADE SECRETS ACT

73.     Alarm.com incorporates and re-alleges paragraphs 1 through 71 of this Complaint as if those allegations are fully set forth in this paragraph.

74.     Alarm.com is the owner of certain confidential and proprietary business information, including but not limited to certain of the materials described in Paragraph 25, which constitute "trade secrets" as defined under the federal Defend Trade Secrets Act.

75.     These trade secrets derive independent economic value from not being generally

known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from their disclosure or use.

76.    Alarm.com has taken reasonable measures to keep such information secret, including, but not limited to, requiring certain employees to enter into agreements respecting Alarm.com's confidential information and trade secrets (such as the Agreement).

77.    Upon information and belief, Berman's conduct as described herein constitutes misappropriation of trade secrets in violation of the federal Defend Trade Secrets Act.

78.    Upon information and belief, as a direct and proximate result of Berman's unlawful conduct, Alarm.com has suffered and continues to suffer actual damages, including loss of business opportunities, competitive advantage, and goodwill.

79.    Upon information and belief, Alarm.com is entitled to injunctive relief, exemplary damages, and attorneys' fees under the federal Defend Trade Secrets Act as a result of Berman's conduct.

## COUNT V – VIOLATIONS OF THE VIRGINIA UNIFORM TRADE SECRETS ACT

80.    Alarm.com incorporates and re-alleges paragraphs 1 through 78 of this Complaint as if those allegations are fully set forth in this paragraph.

81.    Alarm.com is the owner of certain confidential and proprietary business information, including but not limited to certain of the materials described in Paragraph 25, which constitute "trade secrets" as defined under Va. Code Ann. § 59.1-336.

82.    These trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable by, others who can obtain economic value from their disclosure or use.

83.    Alarm.com has taken reasonable measures to keep such information secret,

including, but not limited to, requiring certain employees to enter into agreements respecting Alarm.com's confidential information and trade secrets (such as the Agreement).

84.    Upon information and belief, Berman's conduct as described herein constitutes misappropriation of trade secrets in violation of Virginia law.

85.    Upon information and belief, as a direct and proximate result of Berman's unlawful conduct, Alarm.com has suffered and continues to suffer actual damages, including loss of business opportunities, competitive advantage, and goodwill.

86.    Upon information and belief, Alarm.com is entitled to injunctive relief, exemplary damages, and attorneys' fees under the Virginia law as a result of Berman's conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Alarm.com respectfully requests that this Court find in its favor and provide Alarm.com with the following forms of affirmative relief:

1.    A temporary restraining order and preliminary and permanent injunction, enjoining and restraining Berman, and anyone acting in concert with Berman, from violating, or participating in the violation of, any of the terms of the Agreement, including the Agreement's confidentiality, non-competition, and non-solicitation covenants.

2.    An order requiring Berman to preserve all documents, electronically stored information, and other information relevant to factual allegations and claims contained within this Complaint, including any communications, text messages, or emails on personal electronic devices, such as cellular telephones, or stored in email or other cloud storage accounts.

3.    An order granting a full and complete forensic investigation into Berman's electronic devices, systems, and/or accounts in a manner equitably tailored to preserve and image all relevant or potentially relevant documents, communications, and data relevant to this matter

and to thereafter retrieve any non-public Alarm.com data Berman has improperly retained and/or leverage for purposes of engaging in actions constituting violations of the Agreement;

4.     An order requiring Berman to return any and all copies of Alarm.com's confidential information or property that is in its possession or under its control; to thereafter delete all such information from any computer or other electronic device or electronic storage device or facility that is in his possession or under his control; and to declare to the Court under oath that it has complied with such order.

5.     An order granting preliminary and permanent injunctive relief in accord with Paragraphs 1–4 above, and as separately may be requested at a temporary restraining order hearing, preliminary injunction hearing, and/or any trial;

6.     An order awarding Alarm.com its actual, exemplary, and punitive damages, in an amount to be determined at trial;

7.     An order awarding Alarm.com pre- and post-judgment interest as allowed by law, as well as its attorneys' fees and costs of this action; and

8.     An order awarding any and all other available damages and such other and further relief as the Court deems just and proper.

Dated: October 24, 2025                         Respectfully submitted,

/s/ Paul J. Kennedy
Paul J. Kennedy (Va. Bar No. 29802)
LITTLER MENDELSON, P.C.
815 Connecticut Avenue, NW, Suite 400,
Washington, D.C. 20006
Telephone:  202.414.6855
Facsimile:  202.318.8967
pkennedy@littler.com

Elizabeth A. Lalik (Va. Bar No. 36500)
LITTLER MENDELSON, P.C.
1800 Tysons Boulevard, Suite 500
McLean, Virginia 22102
Telephone: 703.286.3131
Facsimile: 703.842.8517
elalik@littler.com

John W. Hofstetter
LITTLER MENDELSON, P.C.
(*pro hac vice* motion forthcoming)
Key Tower, 127 Public Square, Suite 1600
Cleveland, Ohio 44114
Telephone:  216.623.6094
Facsimile:  216.649.0509
jhofstetter@littler.com

*Attorneys for Plaintiff Alarm.com*